**FOX–GREENWALD SHEET METAL CO., Inc.**

v.

**MARKOWITZ BROS., INC.,**
**Continental Casualty Co.,**
**Blake Construction Co., Inc., Appellant,**
**United States of America.**

No. 23160.

United States Court of Appeals, District of Columbia Circuit.

Argued March 5, 1970.

Decided Oct. 12, 1971.

---

Mr. Robert D. Roadman, with whom Mr. Marshall E. Miller, Washington, D. C., was on the brief, for appellant.

Mrs. Janet R. Spragens, Atty., Department of Justice, with whom Asst. Atty. Gen. Johnnie M. Walters, Messrs. Thomas A. Flannery, U. S. Atty., Lee A. Jackson and Crombie J. D. Garrett, Attys.,

Department of Justice, were on the brief, for appellee United States of America. Mr. Fred B. Ugast, Atty., Department of Justice, also entered an appearance for appellee United States of America.

Before ROBINSON, MacKINNON and ROBB, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This is a contest between the United States (the Government) and Blake Construction Company, Inc. (Blake), intervenors during the tenure of this litigation in the District Court. Both are creditors of Fox-Greenwald Sheet Metal Company (Fox-Greenwald) with competing claims to monies paid into the registry of the court in satisfaction of a judgment in favor of Fox-Greenwald against Markowitz Brothers (Markowitz) and Continental Casualty Company (Continental). The District Court awarded the fund in issue to the Government.[1] Blake, on this appeal, protests that it held the superior claim. We agree, and accordingly reverse the award.

I

Blake was the prime contractor selected by the General Services Administration for construction in the 1960s of a building complex for the National Bureau of Standards at Gaithersburg, Maryland. Blake engaged Markowitz as its mechanical subcontractor for the project and Markowitz, in turn, contracted with Fox-Greenwald for the performance of the sheet metal work.

In August, 1963, facing difficulties in meeting its payroll,[2] Fox-Greenwald asked Blake for a $50,000 loan. To this Blake agreed, but on condition that it be given a $50,000 promissory note to evidence the transaction and, as security for payment of the note, an assignment of all monies due and to become payable to Fox-Greenwald under its contract

---

1. Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc., 301 F.Supp. 1135 (D.D.C. 1969).

2. That, we are told, was because Markowitz was cutting Fox-Greenwald's requisitions. See text *infra* following note 9.

with Markowitz.[3] Aware that Fox-Greenwald had covenanted in the contract against such an assignment without Markowitz' prior written consent,[4] Blake contacted Markowitz in order to ascertain its position. Over the telephone, Markowitz' president gave an unqualified consent to the assignment, and in reliance thereon Blake consummated the loan. It is clear from the evidence that but for that conversation, Blake would not have made the loan.[5]

Blake remitted $20,000 to Fox-Greenwald on August 15, and the remaining $30,000 on August 27, 1963. On the latter date, Fox-Greenwald delivered to Blake a promissory note in the sum of $50,000 payable 60 days thereafter, and executed an assignment of all monies forthcoming from Markowitz under the contract.[6] Markowitz, however, never reduced its previous oral consent to writing. After closing the loan Blake repeatedly requested Markowitz to do so, and after two months discontinued what seemed to be an exercise in futility. The note matured on October 26, 1963, and Fox-Greenwald had paid only $500 on it. In 1964, Blake brought an action [7] on the note in the District Court to recover the balance of principal and interest due.[8] That suit remained pending at the time the court resolved the conflicting claims of Blake and the Government to the fund arising in the case at bar.[9]

In February, 1964, Markowitz terminated its contract with Fox-Greenwald and refused to make further payments on it. Shortly thereafter, Fox-Greenwald filed suit in the District Court against Markowitz and Continental, its surety, for breach of contract. A jury awarded Fox-Greenwald a verdict and the judgment entered on the verdict was affirmed by this court on appeal.[10] Continental, on August 20, 1968, paid the amount of the judgment into the registry of the District Court,[11] and three claimants promptly intervened.[12] One was paid in full,[13] and because the residue of the fund is too small to satisfy the aggregated claims of the other two, the dispute now before us ripened.[14]

The two claimants remaining are Blake, asserting the assignment from

---

3. The contract price for the sheet metal work was $1,050,000. Fox-Greenwald represented that it was then more than 90% complete, and that more than $200,000 was owing under the contract and at least an equal amount would become due on completion.

4. The relevant provision reads:
 Subcontractor agrees that he will not subject, or assign, or transfer this Contract or any part thereof or any interest therein or any moneys due hereunder without first obtaining the written consent of the Contractor.

5. See note 57, infra.

6. Also, two corporations and three persons individually endorsed the note in guaranty of its payment. See note 8, infra.

7. Blake Construction Co. v. Fox-Greenwald Sheet Metal Co., Civ.No. 350–64 (D.D.C.).

8. Joined with Fox-Greenwald as defendants were Sam Fox Sheet Metal Company, a Colorado corporation, and Philip M. Fox, both of whom were guarantors

on the note. See note 6, supra. See also note 87, infra.

9. See note 87, infra.

10. Markowitz Bros., Inc. v. Fox-Greenwald Sheet Metal Co., 130 U.S.App.D.C. 217, 399 F.2d 588 (1968).

11. Continental's reason, as alleged in its petition, was notification by creditors of Fox-Greenwald of claims totaling an amount in excess of the judgment.

12. Blake, the Government, and the attorney who had represented Fox-Greenwald.

13. See note 14, infra.

14. The amount Continental paid into court was $114,232.49. Pursuant to a stipulation of the intervening creditors, the District Court has paid therefrom $28,878.97 to Fox-Greenwald's attorney for fees and advanced costs, leaving a balance of $85,352.52. At the time of intervention, the Government's claim was $112,189.45 plus interest and additions provided by law, and Blake's claim was $50,000 with 6% interest from August 27, 1963, subject to a credit for the $500 Fox-Greenwald had paid.

Fox-Greenwald of the amounts due it from Markowitz, and the Government, endeavoring to enforce unsatisfied tax liens filed against Fox-Greenwald after the assignment.[15] Under the law then in force,[16] the tax liens took precedence over Blake's claim if the assignment did not elevate it to a secured status;[17] otherwise, as the Government appears to concede, the claim outranked the subsequently-filed tax liens.[18] Thus priority between the Government and Blake to the fund depended upon the validity and enforceability of the assignment.[19] The District Court held that the antiassign-

ment clause in Markowitz' contract with Fox-Greenwald, coupled with Markowitz' refusal to furnish a written consent, rendered the assignment ineffective against the Government, and that in any event the statute of limitations barred its enforcement.[20] We think the District Court erred on both points.

## II

In asserting its claim of priority to the in-court fund, Blake does not challenge the validity of the nonassignability clause contained in Markowitz' contract with Fox-Greenwald.[21] Blake ar-

15. The assessments were made between December 16, 1963, and March 13, 1964, and the liens were filed between February 17 and May 6, 1964, in all cases subsequent to consummation of Blake's loan to Fox-Greenwald and the execution of the latter's assignment to Blake.

16. The events giving rise to the respective claims of the Government and Blake transpired prior to the Federal Tax Lien Act of 1966, 80 Stat. 1125 (1966), 26 U.S.C. § 6323 et seq. (Supp. V 1965–1969). The pre-Act provisions are relevant not only for that reason but also because pre-Act priorities enjoyed by parties other than the Government remain unimpaired by the Act. 80 Stat. 1146 (1966).

17. Section 6321 of the Internal Revenue Code of 1954, 26 U.S.C. § 6321 (1958), imposed "a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to" the delinquent taxpayer. Section 6322 of the Code, 26 U.S.C. § 6322 (1958), provided generally that the lien "shall arise at the time the assessment is made. * * *" However, Section 6323(a), 26 U.S.C. § 6323(a) (1958), specified that the lien "shall not be valid as against" certain classes of persons until notice thereof was filed. See United States v. Leventhal, 114 U.S.App.D.C. 340, 342, 316 F.2d 341, 343 (1963). Among those protected against an unfiled lien were assignees whose prior liens were choate—were, as expressed in United States v. City of New Britain, 347 U.S. 81, 86, 74 S.Ct. 367, 371, 98 L.Ed. 520 (1954), "certain as to amount, identity of the lienor [and] the property subject thereto." See cases cited *infra* note 18. As we have pointed out, *supra*

note 15, Blake's loan and Fox-Greenwald's assignment antedated the assessments of the taxes and the filing of the liens. And while it is unclear from the record whether Maryland or District of Columbia law governs the mechanics of the assignment transaction, see note 44, *infra*, neither imposed a filing requirement as assignments of choses in action. See D.C.Code § 28–2303 (1951); Md. Code art. 8, § 1 (1957).

18. Aside from the possible effect of the antiassignment clause, considered in Parts II and III, *infra*, it seems clear that Fox-Greenwald's assignment to Blake satisfied the choateness requirement, see note 17, *supra*. Crest Finance Co. v. United States, 368 U.S. 347, 82 S.Ct. 384, 7 L.Ed.2d 342 (1961), rev'g 291 F.2d 1 (7th Cir. 1961). See also United States v. Pioneer Am. Ins. Co., 374 U.S. 84, 91 n. 9, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963); Corigliano v. Catla Const. Co., 231 F.Supp. 245, 248–249 (S.D.N.Y.1964). *Cf.* United States v. R. F. Ball Const. Co., 355 U.S. 587, 593–594, 78 S.Ct. 442, 2 L.Ed.2d 510 (1958).

19. There is no claim, or basis in the record for assuming, that Fox-Greenwald, for all its apparent woes, is insolvent. See 31 U.S.C. § 191 (1964); United States v. Vermont, 377 U.S. 351, 357–358, 84 S.Ct. 1267, 12 L.Ed.2d 370 (1964); United States v. City of New Britain, *supra* note 17, 347 U.S. at 85, 74 S.Ct. 367.

20. Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., Inc., *supra* note 1, 301 F.Supp. at 1136–1137.

21. The courts have almost invariably sustained the validity of such provisions. See cases collected in Annot., 37 A.L.R. 2d 1251 (1954). We have intimated a

gues, rather, that as a matter of proper interpretation of the clause, only Markowitz could insist upon its observance. In that position Blake finds solid support in the decisions.

Judicial holdings sustain overwhelmingly the proposition that a contractual ban on assignment ordinarily serves to protect the obligor alone, and in no way imperils the transaction as between assignor and assignee.[22] "Where a term in a contract prohibits assignment and is not rendered ineffective by statute or otherwise, the term is to be construed, unless a different intention is manifested, * * * to be for the benefit of the obligor, and not to prevent the assignee from acquiring rights against the assignor. * * * "[23] The obligor, of course, may gain from a valid and unwaived nonassignability provision the prerogative to resist or even nullify the assignment.[24] That does not mean, however, that the assignee cannot compel the assignor to stand by his bargain where the obligor has not seen fit to interfere.[25] And perhaps nowhere has the rule that an assignment offending such a provision normally binds the assignor to the assignee seen greater application than where the assigned claim was for monies due or to become due under a contract.[26]

.The District Court recognized these principles for the most part. "If," said the court, "this proceeding were merely to decide any claim to the fund as between Blake and Fox-Greenwald, the rights, so far as the assignment is concerned, would be with Blake, notwithstanding failure of Markowitz to execute a written consent to it." [27] Referring to some of the precedents, however, the court felt that "[t]hese cases are authority to sustain the validity *between the*

---

similar view, Meyer v. Washington Times Co., 64 App.D.C. 218, 220, 76 F.2d 988, 990, cert. denied, 295 U.S. 734, 55 S.Ct. 646, 79 L.Ed. 1682 (1935). See, however, Portuguese-American Bank v. Welles, 242 U.S. 7, 11–12, 37 S.Ct. 3, 61 L.Ed. 116 (1916), but see also Martin v. National Sur. Co., 300 U.S. 588, 57 S.Ct. 531, 81 L.Ed. 822 (1937).

22. *E. g.*, Paxson v. Commissioner of Internal Revenue, 144 F.2d 772, 775 (3d Cir. 1944) (agency contract); Johnston v. Landucci, 21 Cal.2d 63, 130 P.2d 405, 408, 148 A.L.R. 1355 (1942) (land contract); Home Builders, Inc. v. Dellwood Corp., 379 Pa. 255, 108 A.2d 731, 733 (1954) (dealer franchise agreement). See also the cases cited *infra* notes 24, 26, and numerous earlier cases collected in Annot., 148 A.L.R. 1361 (1944). And see 4 A. Corbin, Contracts § 873 at 496–497 (1951); 1 G. Gilmore, Security Interests in Intangible Property § 7.8 at 220–221 (1965); 3 S. Williston, Contracts § 423 at 140–144 (3d ed. 1960). We speak, of course, only of an assignment or rights as distinguished from an attempted delegation of an obligation. We also distinguish the situation sometimes encountered, notably in statutes and trusts, where an antiassignment provision is plainly intended to protect the assignor.

23. Restatement (Second) of Contracts § 154 (Tent.Draft No. 3, 1967). This statement would change the earlier version, Restatement of Contracts § 176 (1932), from a flat rule of law to a canon of interpretation, and we regard the latter as the true basis of the decisions.

24. See, *e. g.*, Guerin v. Blair, 33 Cal.2d 744, 204 P.2d 884, 885–886 (1949); Detroit Greyhound Employees Fed. Credit Union v. Aetna Life Ins. Co., 7 Mich. App. 430, 151 N.W.2d 852, 856 (1967); Concrete Form Co. v. W. T. Grange Const. Co., 320 Pa. 205, 181 A. 589, 590 (1935).

25. See cases cited *supra* notes 22, 24 and *infra* notes 26, 33.

26. *E. g.*, Frank Sullivan Co. v. Midwest Sheet Metal Works, 335 F.2d 33, 39 (8th Cir. 1964); Dole Co. v. Aetna Cas. & Sur. Co., 269 F.Supp. 72, 79 (D.Me. 1967); McLaughlin v. New England Tel. & Tel. Co., 345 Mass. 555, 188 N.E.2d 552, 558 (1963); Charles I. Hosmer, Inc. v. L. P. Federico & Son, 89 N.H. 378, 199 A. 567, 568 (1938); McClendon v. Dean, 45 N.M. 496, 117 P.2d 250, 254 (1941). See also Portuguese-American Bank v. Welles, *supra* note 21, 242 U.S. at 12, 37 S.Ct. 3.

27. Fox-Greenwald Sheet Metal Co. v. Markowitz Bros., *supra* note 1, 301 F.Supp. at 1136.

*parties* of the assignment in question," [28] but that "[t]hey do not sustain a priority claim against a subsequent judgment lien." [29] "In this case," the court concluded, "the rights of the United States have intervened by reason of the tax liens which were filed" [30] and "the lien of the United States is superior to the claim of Blake and must be enforced by payment from the registry of the court to the extent that such fund is available in amount." [31]

■ We cannot readily share the District Court's view that the Government's tax lien on the monies due Fox-Greenwald by Markowitz prevails over the security lien which the assignment purported to confer upon Blake. Surely that view encounters formidable difficulties when examined in light of the principles which underlie the canon favoring inter-parties validity of assignments contractually forbidden. There is not the slightest whisper in the record of an intention to benefit anyone but Markowitz by insertion of the antiassignment provision in its contract with Fox-Greenwald. By the same token, Fox-Greenwald's assignment to Blake, though in contravention of that prohibition, was not void on that account; it was, as we have said, valid and binding as between Blake and Fox-Greenwald, subject at most to such rights as Markowitz had and might assert under the nonassignability clause.[32] The important consideration is that only Markowitz could avail itself of that option; third parties could gain naught from it. That is evident from cases wherein the offending assign-ment was upheld, not only as between the assignor and the assignee, but against creditors of the assignor as well.[33] But the District Court's decision permitted the Government, as a creditor of Fox-Greenwald, to upset a transaction Fox-Greenwald itself was powerless to disturb, and to defeat an assignment indefeasible at the instance of Fox-Greenwald. It likewise permitted the Government, whose rights to the monies were derivative through Fox-Greenwald, to gain priority over Blake to whose rights by assignment Fox-Greenwald's own interest in the monies was subordinate.[34]

### III

Were we called upon to make an independent determination of the effect of the antiassignment clause upon the assignment to Blake, we would unhesitatingly follow the course of judicial decision heavily prevailing across the Nation. The canonical rule that, absent manifestation of a broader purpose, such a clause will be construed as protection for the obligor only, appeals to us as an accurate reflection of what the parties very probably intended. Obligors naturally shy away from the prospect of conflicting claims and the specter of double liability; they may well be interested in the obligee's personal performance and apprehensive about any material change in duties in that regard. These are the concerns usually dictating inclusion of a nonassignability provision; the realities of everyday business experience militate against any unsupported presumption that the parties had the in-

---

28. *Id.* (emphasis in original).

29. *Id.*

30. *Id.*

31. *Id.*

32. Text *supra* at notes 22–26.

33. See, *e. g.*, McLaughlin v. New England Tel. & Tel. Co., *supra* note 26; Staples v. City of Somerville, 176 Mass. 237, 57 N.E. 380, 381 (1900); McClendon v. Dean, *supra* note 26. See also Portuguese-American Bank v. Welles, *supra* note 21.

"Ordinarily a contractual prohibition of assignment is for the benefit of the obligor. In such cases third parties cannot assert the invalidity of a prohibited assignment if the obligor makes no objection." Restatement (Second) of Contracts § 154 comment *d* at 194. (Tent. Draft No. 3, 1967). We also note that in Paxson v. Commissioner of Internal Revenue, *supra* note 22, like here, the assignor's creditor was the Government asserting a tax deficiency.

34. See cases cited *supra* notes 26, 33.

terests of anyone but the obligee in mind. Consequently, "as assignment has become a common practice, the policy which limits the validity of restraints on alienation has been applied to the construction of contractual terms open to two or more possible constructions," [35] and that makes good sense to us.

■■ It is not, however, our mission, as we conceive it, to resolve the issue as a matter of either federal or District of Columbia law. For while "[t]he effect of a lien in relation to a provision of federal law for the collection of debts owing the United States is always a federal question," [36] the efficacy of particular transactions to generate nonfederal rights in property, including liens, is not.[37] Federal law, of course, furnishes the standard by which the relative priority of federal tax liens and state-created liens is ascertained,[38] that is, whether the state lienholder falls within the class

shielded against the federal lien.[39] But the question whether given events are effective to give rise to a nonfederal lien is clearly one of state law; [40] obviously, the transaction must pass muster under state law before a federal question is reached. Here the question is whether, in view of the nonassignability provision and Markowitz' refusal of consent, the assignment to Blake was effective at all.[41] That aspect of the case, we think, must be left to state law—the applicable state rule fixing the consequences to be attached to that provision.

■ By that we do not mean the District of Columbia law. For although the District was the forum chosen for Fox-Greenwald's suit against Markowitz, so far as the record discloses it had little or no connection with the contract between them, into which the antiassignment clause was incorporated.[42] Manifestly,

35. Restatement (Second) of Contracts § 154, comment a at 192 (Tent.Draft No. 3, 1967).

36. United States v. Security Trust & Sav. Bank, 340 U.S. 47, 49, 71 S.Ct. 111, 95 L.Ed. 53 (1950) ; See also United States v. Pioneer Am. Ins. Co., *supra* note 18, 374 U.S. at 88 n. 7, 83 S.Ct. 1651, 1655, and cases there cited.

37. See cases cited *infra* note 40.

38. *E. g.*, United States v. Pioneer Am. Ins. Co., *supra* note 18, 374 U.S. at 88–89, 83 S.Ct. 1651; United States v. City of New Britain, *supra* note 17, 347 U.S. at 86, 74 S.Ct. 367; United States v. Security Trust & Sav. Bank, *supra* note 36, 340 U.S. at 50, 71 S.Ct. 111.

39. *E. g.*, Stevan v. Union Trust Co., 115 U.S.App.D.C. 36, 41–42, 316 F.2d 687, 692–693 (1963).

40. *Id.* There we pointed out that "[i]n the ordinary course of affairs the initial determination of the character of the lien under state law is determined by a state court and that decision is final on the interpretation of state law." See also United States v. Cohen, 271 F.Supp. 709, 716 (S.D.Fla.1967) ; United States v. Lebanon Woolen Mills Corp., 241 F. Supp. 393, 395 (D.N.H.1964) ; Corigliano v. Catla Const. Co., *supra* note 18, 231 F.Supp. at 247 ; Three Mountaineers, Inc. v. Ramsey, 143 F.Supp. 888, 892–893

(W.D.N.C.1956) ; United States v. Truss Tite, Inc., 285 F.Supp. 88, 91 (S.D.Tex. 1968). And see United States v. American Nat'l Bank, 255 F.2d 504, 506–507 (5th Cir.), cert. denied, 358 U.S. 835, 79 S.Ct. 58, 3 L.Ed.2d 72 (1958). An analogy is found in the well settled rule that the existence of property to which the federal tax lien might attach is a question of state law although, of course, the domain of federal law is entered once it is ascertained that the lien has attached to some state-created interest. *E. g.*, United States v. Durham Lumber Co., 363 U.S. 522, 526, 80 S.Ct. 1282, 4 L.Ed. 2d 1371 (1960) ; Aquilino v. United States, 363 U.S. 509, 513–514, 80 S.Ct. 1277, 4 L.Ed.2d 1365 (1960) ; United States v. Bess, 357 U.S. 51, 55, 78 S.Ct. 1054, 2 L.Ed.2d 1135 (1958).

41. As we have stated, text *supra* at notes 16–19, the priority of Blake's assignment lien over the Government's tax lien is clear, indeed is seemingly conceded, if the assignment was not frustrated by the contract prohibition.

42. Neither Markowitz nor Fox-Greenwald is a District of Columbia corporation. We have no indication that either conducts business within the District. The place where the contract between them was made does not appear in the record before us.

then, we are not to draw upon District law, but instead upon the law of the jurisdiction having the more essential contacts with the contract transaction.[43]

Preliminarily, we note that it is the locus of that transaction, and not the assignment transaction,[44] that is vital in the choice-of-law process. The controversy does not emanate from the events by which Fox-Greenwald undertook to assign to Blake, but from the contract between Markowitz and Fox-Greenwald containing the nonassignability provision. The Government's challenge is not based on alleged deficiencies in the assignment itself, but on the claim that the antiassignment clause disabled Fox-Greenwald from making any sort of assignment of rights under the contract. The question thus arising is the construction properly to be given to that clause, and that question is referable to the law governing the interpretation of the contract.[45]

■ The constructional problem, in our view, is to be treated under the law of Maryland, where the contract called for performance.[46] It was, as we have

---

**43.** See, e. g., Richards v. United States, 369 U.S. 1, 8–9, 82 S.Ct. 585, 7 L.Ed. 2d 492 (1962); Vanston Bond Holders Protective Committee v. Green, 329 U.S. 156, 161–162, 67 S.Ct. 237, 91 L.Ed. 162 (1946); Tramontana v. S. A. Empresa De Viacao Aerea Rio Grandense, 121 U.S. App.D.C. 338, 341–343, 350 F.2d 468, 471–473 (1965), cert. denied, 383 U.S. 943, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); Dovell v. Arundel Supply Corp., 124 U.S.App.D.C. 89, 90–92, 361 F.2d 543, 544–546, cert. denied, 385 U.S. 841, 87 S.Ct. 93, 17 L.Ed.2d 74 (1966); Lummus Co. v. Commonwealth Oil Ref. Co., 280 F.2d 915, 924–925 (1st Cir.), cert. denied, 364 U.S. 911, 81 S.Ct. 274, 5 L.Ed.2d 225 (1960); Fleet Messenger Serv. v. Life Ins. Co., 315 F.2d 593, 596 (2d Cir. 1963); Neville Chemical Co. v. Union Carbide Corp., 422 F.2d 1205, 1210–1211 (3d Cir.), cert. denied, 400 U. S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970); Bowles v. Zimmer Mfg. Co., 277 F.2d 868, 872–873 (7th Cir. 1960). See also Restatement (Second), Conflict of Laws § 6 (1971).

**44.** Again the record leaves us very much in the dark. Fox-Greenwald is a Maryland corporation, and was then engaged in a large construction project in Maryland; conceivably, the assignment transaction could have occurred there. A somewhat stronger suggestion is that the situs of the assignment transaction was Blake's place of business in the District, and it is clear that Fox-Greenwald's note was payable there.

**45.** Newspaper Readers Serv. v. Canonsburg Pottery Co., 146 F.2d 963, 965 (3d Cir. 1945) (assignability of rights under contract); Canister Co. v. National Can Corp., 6 F.R.D. 613, 614 (D.Del.1946) (assignability of contractual right); Wetherell Bros. Co. v. United States

Steel Co., 105 F.Supp. 81, 86 (D.Mass.), aff'd, 200 F.2d 761 (1st Cir. 1952) (assignability of franchise right without other contracting party's consent); Hunter-Wilson Distilling Co. v. Foust Distilling Co., 84 F.Supp. 996, 999 (M.D. Pa.1949), modified, 181 F.2d 543 (3d Cir. 1950) (assignability of warranty); Eagle v. New York Life Ins. Co., 48 Ind. App. 284, 91 N.E. 814, 818 (1910) (assignability of insurance policy as collateral security for loan).

The Restatement (Second), Conflict of Laws § 208 (1971), sums it up. It provides that "[w]hether, and under what conditions a contractual right, which is not embodied in a document, can be effectively assigned is determined by the local law of the state which has the most significant relationship to the contract and the parties with respect to the issue of assignability." That law "determines whether there must be consent to the assignment by the obligor or by some third person, as the beneficiary of a life insurance policy." Id., comment a. Only if the right is so assignable does there arise a question as to what law governs the validity of the assignment and the rights created thereby as between the assignor and the assignee. Restatement Second, Conflict of Laws § 209, comment a (1971).

**46.** Alexander v. Barker, 64 Kan. 396, 67 P. 829, 830–831 (1902); Garnes v. Frazier & Foster, 118 S.W. 998, 999 (Ct. App.Ky.1909); Cookson v. Knauff, 157 Pa.Super. 401, 43 A.2d 402, 407–408 (1945); Baffin Land Corp. v. Monticello Motor Inn, 70 Wash.2d 893, 425 P.2d 623, 627 (1967). The same conclusion has been reached where, as here, the place of making did not appear, Elk River Coal & Lumber Co. v. Funk, 222 Iowa 1222, 271 N.W. 204, 208–209 (1937); Watts

said, a contract to do the sheet metal work in a five-building complex; it was, too, a contract requiring a performance of substantial size and duration.[47] There is nothing before us to indicate that the parties had any expectation that the contract might be construed by reference to any other law, nor to suggest that any other state bore a more significant relationship to the contract. We turn, then, to the Maryland law for such guidance as it may afford in the interpretation of the antiassignment clause.[48]

The validity of contract provisions prohibiting assignment has been upheld in Maryland,[49] and the Maryland approach to construction of such provisions does not seem to differ essentially from that prevalent in other parts of the country. While Maryland holds an assignment inoperative in the face of a nonassignability clause intended for the protection of the assignor,[50] its highest court has recognized the effectiveness of assignments between assignor and assignee where, as here, the prohibition is not so designed.[51] The pains the court

v. Long, 116 Neb. 656, 218 N.W. 410, 412–413 (1928), and where the services were to be rendered by independent contractors and their servants, United States-Alaska Packing Co. v. Luketa, 58 F.2d 944, 945–946 (9th Cir. 1923); Pratt v. Sloan, 41 Ga.App. 150, 152 S.E. 275, 277 (1930). The Restatement (Second), Conflict of Laws § 196 (1971), declares that "[t]he validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship * * * to the transaction and the parties, in which event the local law of the other state will be applied."

47. The contract price for the sheet metal work to be done by Fox-Greenwald was $1,050,000, and the record indicates that Fox-Greenwald engaged in performance over a period of about a year before Markowitz terminated the contract. As stated in the Restatement (Second), Conflict of Laws § 196, comment *b* (1971), "[t]he importance in the choice-of-law process of the place where the services, or a major portion of the services, are to be rendered depends somewhat upon the nature of the services involved. This place enjoys greater significance when the work is to be more or less stationary and is to extend over a considerable period of time. This is true of a contract for employment on the ordinary labor force of a particular factory or of a contract with an independent contractor who will provide labor on a construction project."

48. "Several factors serve to explain the importance attributed by the rule to the

place where the contract requires services, or a major portion of the services, be rendered. The rendition of the services is the principal objective of the contract, and the place where the services, or a major portion of the services, are to be rendered will naturally loom large in the minds of the parties. Indeed, it can often be assumed that the parties, to the extent that they thought about the matter at all, would expect that the local law of the state where the services, or a major portion of the services, are to be rendered, would be applied to determine many of the issues arising under the contract. The state where the services are to be rendered will also have a natural interest in them and indeed may have an overriding interest in the application to them of certain of its regulatory rules. The rule of [Section 196] also furthers the choice-of-law values of certainty, predictability and uniformity of result and, since the place where the contract requires that the services, or a major portion of the services, are to be rendered will be readily ascertainable, of ease in the determination of the applicable law." Restatement (Second), Conflict of Laws § 196 comment *c* (1971).

49. *E. g.*, Bimestefer v. Bimestefer, 205 Md. 541, 109 A.2d 768, 770–771 (1954); Michaelson v. Sokolove, 169 Md. 529, 182 A. 458, 459–460 (1936).

50. Bimestefer v. Bimestefer, *supra* note 49, 109 A.2d at 771 (restriction on assignment of benefits under employees' group life insurance certificate). Michaelson v. Sokolove, *supra* note 49, 182 A. at 459–460 (restriction on assignment of insurance benefits payable to surviving widow or children).

51. See Bimestefer v. Bimestefer, *supra* note 49, 109 A.2d at 772; Michaelson v. Sokolove, *supra* note 49, 182 A. at 460.

has taken to sharply distinguish the two situations [52] make it evident that interpretation of antiassignment provisions is an integral part of the decisional process. And the court's constructional preference is sufficiently indicated by its declination in Rubberoid Company v. Glassman Construction Company [53] to extend the scope of a nonassignability clause beyond its plainly apparent purpose.[54] We note also, as a reflection of state policy, that shortly after the assignment in suit Maryland adopted the Uniform Commercial Code,[55] which goes to the extent of outlawing restrictions on the transferability of accounts receivable in security transactions.[56] With these circumstances, and the absence of a more definitive ruling, we are unwilling to assume that Maryland would fashion and apply to the situation at bar a constructional rule at variance with the strong current of judicial opinion elsewhere.[57]

## IV

█ Statutes of limitation are statues of repose; their purpose is to quiet stale controversies, the evidence as to which may be eroded by time.[58] Neither of the two debtors here involved—Fox-Greenwald or Markowitz—has itself urged a time barrier to Blake's resort to the fund held in the registry of the District Court. The Government, however, as a creditor of Fox-Greenwald, invoked such a limitation [59] against Blake, another Fox-Greenwald creditor,[60] on the basis of the long interval between the accrual of Blake's cause of action on Fox-Greenwald's note and Blake's effort to enforce the assignment securing it. In the interest of clarity, we recount the relevant events.

By its terms, the note matured on October 26, 1963,[61] and only $500 had been paid on it. It was secured by Fox-Greenwald's assignment to Blake of all monies due and to become due from Markowitz pursuant to the contract for the sheet metal work. Markowitz' liability under the contract was the subject of earlier inquiry in this case, begun in 1964, and the monies Markowitz was found to have owed comprised the in-court fund in original amount. Blake did not intervene to assert an interest in the litigation or the resulting fund

52. Michaelson v. Sokolove, *supra* note 49, 182 A. at 460. See also Bimestefer v. Bimestefer, *supra* note 49, 109 A.2d at 772.

53. 248 Md. 97, 234 A.2d 875, 878–879 (1967).

54. There the Court held that a prohibition against assignment of a subcontractor's interest under a building subcontract without the general contractor's consent did not preclude an equitable assignment resulting from change of the subcontractee from a sole proprietorship to a corporation where the interests of the general contractor—the beneficiary of the nonassignment provision—were unaffected. 234 A.2d at 878–879.

55. Md.Acts 1963, ch. 538, Md.Code Ann. art. 95B (1964 Replacement), effective February 1, 1964.

56. "A term in any contract between an account debtor and an assignor which prohibits assignment of an account or contract right to which they are parties is ineffective." Md.Code Ann. art. 95B,

§ 9–318(4) (1964 Replacement). The official comment to this subsection points to its applicability to assignment of "sums due and to become due under * * construction contracts," among others, "even if made to an assignee who took with full knowledge that the account debtor had sought to prohibit or restrict assignment of the account or of the money to be earned under the contract."

57. In this view, we do not reach other problems related to the antiassignment clause, including the question whether its enforcement was in any event precluded by an estoppel arising from Markowitz' telephonic consent and Blake's change of position in reliance thereon. See text *supra* at notes 4–6.

58. Poole v. Terminix Co., 91 U.S.App.D.C. 287, 288, 200 F.2d 746, 747 (1952).

59. D.C.Code § 12–301(7) (1967), discussed in text at note 64 et seq.

60. See note 86, *infra*.

61. That is, 60 days after August 27, 1963, its date.

until August, 1968.[62] The District Court held, and the Government argues here, that by then the statute of limitations had barred all rights in the fund which Blake may have derived by virtue of the assignment. This view we cannot accept.

The parties' transactions generated two claims, each susceptible to a statutory time bar, and it is important to carefully differentiate them. One was Blake's claim against Fox-Greenwald on the note evidencing the loan. The other was Fox-Greenwald's claim against Markowitz on the contract, which was assigned to Blake as security for the payment of the note. They were separate claims with separate origins, involving different debtors and different obligations. They were interrelated only in the sense that Blake's derivative claim against Markowitz secured Blake's original claim against Fox-Greenwald. And they were unrelated, in the sense that prosecution of each claim presented its own problems in terms of the statute.[63]

The District's general statute of limitations[64] as the law of the forum, governed the litigation in which the parties have engaged.[65] The statute specifies enforcement periods of twelve years for contracts under seal[66] and three years for all other contracts.[67] The three-year period applied to suit on Fox-Greenwald's note[68] and, we may assume with the record devoid of anything to summon the longer period, to suit on the assigned debts of Markowitz as well.[69] As to each, the statute started running when the cause of action

62. Blake's motion for leave to intervene was filed on August 1, 1968, leave was granted on August 21, and Blake's petition demanding payment from the fund was filed on the day following. We intimate no view as to whether a statute of limitations is tolled upon the filing of a motion for leave to intervene or only upon the allowance of intervention.

63. As later appears in text, solution of the problems allied with one claim might ameliorate, but would not eliminate, the problems incidental to the other.

64. D.C.Code § 12–301 (1967).

65. Filson v. Fountain, 90 U.S.App.D.C. 273, 274, 197 F.2d 383, 384 (1952); Kaplan v. Manhattan Life Ins. Co., 71 App.D.C. 250, 252–253, 109 F.2d 463, 465–466 (1939); Wells v. Alropa Corp., 65 App.D.C. 281, 282, 82 F.2d 887, 888 (1936).

66. D.C.Code § 12–301(6) (1967).

67. D.C.Code § 12–301(7) (1967).

68. The note bore Fox-Greenwald's corporate seal but did not indicate, by recital or otherwise, that the execution of a sealed instrument was intended. In such circumstances, we accept the corporate seal only as a mark of identification and genuineness, and the twelve-year limitation on the enforcement of sealed instruments does not apply. See Simonson v. International Bank, 114 U.S.App.D.C. 160, 312 F.2d 887 (1963); Sigler v. Mt.

Vernon Bottling Co., 104 U.S.App.D.C. 260, 261–262, 261 F.2d 378, 379–380 (1958). Rather, the three-year period applicable to "a simple contract, express or implied," D.C.Code § 12–301(7) (1967), governed suit on the note. Munter v. Lankford, 98 U.S.App.D.C. 116, 117, 232 F.2d 373, 374 (1956); Brice v. Walker, 73 App.D.C. 377, 378, 121 F.2d 864, 865 (1941); Hoffman v. Sheahin, 73 App.D.C. 374, 375–377, 121 F.2d 861, 862–864 (1941).

69. The record does not reveal whether Markowitz' obligation to pay Fox-Greenwald for the sheet metal work was embodied in a sealed contract, which would invoke the 12-year limitation. See text *supra* at note 66. Since in either event our conclusion would be the same, we act on the assumption that it did not. And since an assignee stands in the shoes of his assignor, deriving the same but no greater rights and remedies than the assignor then possessed, see, e. g., 3 S.Williston, Contracts, § 432 (3d ed. 1960); Restatement of Contracts § 167(1) (1932), the statute of limitations continues to run against the assignee as it had against the assignor before. See United States v. Nashville C. & St. L. Ry., 118 U.S. 120, 125, 6 S.Ct. 1006, 30 L.Ed. 81 (1886); United States v. Buford, 28 U.S. (3 Pet.) 12, 30–31, 7 L.Ed. 585 (1830); Campbell v. Wilson, 13 D.C. (2 Mackey) 497, 500–501 (1883); United States v. Taylor, 144 F.Supp. 15, 17 (E.D.Pa.1956).

arose,[70] subject to arrest upon commencement of appropriate litigation.[71] With these basic principles in mind, we turn to a consideration of each of the two claims.

 Blake's cause of action on its principal claim, attested to by Fox-Greenwald's note, ripened on October 27, 1963, the day after the note matured without payment.[72] Blake's suit against Fox-Greenwald on the note[73] was brought during 1964, well within the three-year period. The action tolled the statute on the note,[74] and the action was still pending when the District Court passed its decision on the parties' conflicting claims to the fund. Thus Blake's right to enforce, in that action, Fox-Greenwald's obligation on the note was then still preserved.[75]

 Blake's suit against Fox-Greenwald, however, did not interrupt the running of the statute as to Blake's claim against Markowitz on the obligations assigned by Fox-Greenwald. The creditor's causes of action on the principal debt and on an assigned chose securing it are independent.[76] A suit halting the statute on one debt does not automatically have the same effect on another debt comprising its security.[77] Nor could Fox-Greenwald's assignment of Markowitz' debts to Blake *ex proprio vigore* extend Markowitz' liability beyond the enforcement period set by the statute.[78] We must, therefore, investigate further to ascertain whether the statute foreclosed Blake's claim for the monies due Fox-Greenwald by Markowitz before Blake sought to litigate it.

As we have stated, Fox-Greenwald undertook an assignment to Blake not only of accounts already due by Markowitz but also of accounts to become due. The statute, of course, would not begin to run on any obligation of Markowitz

---

**70.** Hanna v. Fletcher, 97 U.S.App.D.C. 310, 313, 231 F.2d 469, 472, cert. denied, Gichner Iron Works, Inc. v. Hanna, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501 (1956); H. Herfurth, Jr., Inc. v. Acker, 85 U.S.App.D.C. 158, 159, 177 F.2d 38, 39 (1949); Howard University v. Cassell, 75 U.S.App.D.C. 75, 79, 126 F.2d 6, 10 (1941), cert. denied, 316 U.S. 675, 62 S.Ct. 1046, 86 L.Ed. 1749 (1942).

**71.** Reynolds v. Needle, 77 U.S.App.D.C. 53, 54, 132 F.2d 161, 162 (1942); Maier v. Independent Taxi Owner's Ass'n, 68 App.D.C. 307, 309, 96 F.2d 579, 581 (1938); Branham v. Johnson, 66 App. D.C. 230, 231, 85 F.2d 807, 808 (1936).

**72.** It has long been held in this jurisdiction that in computing the limitation period, the day on which the cause of action accrues is to be excluded. Baker & Bro. v. Ramsburg's Sons, 15 D.C. (4 Mackey) 1, 3 (1885). That rule is incorporated in the Uniform Commercial Code, now in force in the District of Columbia, D.C.Code § 28:3–122 (1967).

**73.** See note 7, *supra*, and accompanying text.

**74.** See cases cited *supra* note 71.

**75.** We hasten to add, however, that even if this were not so Blake's right to enforce Markowitz' liability on the assigned obligations would not be impaired. The rule is well settled that the running of a statute of limitations on the principal debt does not itself affect the creditor's right to resort to the security. Lewis v. Hawkins, 90 U.S. (23 Wall.) 119, 125–126, 23 L.Ed. 113 (1874); Lavin v. Lynch, 203 Mich. 143, 168 N.W. 1024, 1025, 2 A.L.R. 804 (1918); Hyde v. Hartford Fire Ins. Co., 70 Neb. 503, 97 N.W. 629, 631 (1903); Hulbert v. Clark, 128 N.Y. 295, 28 N.E. 638, 639–640 (1891); Batten v. Jurist, 306 Pa. 64, 158 A. 557, 559, 81 A.L.R. 625 (1932); Connecticut Mut. Life Ins. Co. v. Dunscomb, 108 Tenn. 724, 69 S.W. 345, 346 (1902); United Cigarette Machine Co. v. Brown, 119 Va. 813, 89 S.E. 850, 854–855 (1916).

**76.** The statute may commence at a different time on the security than on the debts, as in the present case. See also Peterson v. Rochelle, 287 S.W. 1105, 1106 (Tex.Civ.App.1926). Additionally, the statutory periods may be of different lengths. See Brice v. Walker, *supra* note 68, 73 App.D.C. 377, 121 F.2d 864.

**77.** See Yazoo Delta Mortgage Co. v. Harlow, 150 Miss. 105, 116 So. 441, 445–456 (1928).

**78.** See Campbell v. Wilson, *supra* note 69, 13 D.C. (2 Mackey) at 500.

until it fell due,[79] and the record leaves fuzzy the extent to which the in-court fund might represent debts maturing subsequent to Fox-Greenwald's default on the notes. In any event, Blake's cause of action against Markowitz accrued in toto during February, 1964, when Markowitz repudiated its contract with Fox-Greenwald and refused further payments on it.[80] Measuring the three-year limitation period from that point, it follows that the statute, absent some circumstances suspending it, would have completed its run during February, 1967.

The statutory bar did not, however, fall so soon. Fox-Greenwald instituted suit—the case at bar—against Markowitz in 1964, well within the limitation period, on the selfsame claim that had previously been assigned to Blake as security for the payment of the note. With legal title and security rights to the assigned choses,[81] Blake could, and indeed properly should, have joined in the action as a real party in interest.[82] But though Blake did not collaborate in the bringing of the suit, Blake did gain party status therein, and rightly so,[83] through intervention by leave of court, during the course of the supplemental proceedings directed toward disposition of the in-court fund, which arose in satisfaction of the judgment on the already-assigned claim. It is well settled that, even after the expiration of the statutory period, an assignee may be admitted to an action commenced by his assignor after the assignment but before the statute has run.[84] Here, Blake's intervention introduced no new cause of action but facilitated a terminal ruling on the old.[85] Fox-Greenwald's suit against Markowitz, we hold, arrested the statute, not only for itself, but upon Blake's intervention for the benefit of the latter as well.

We conclude, then, that the assignment to Blake was valid and effective against Fox-Greenwald, that the statute of limitations did not proscribe Blake's access to it, and that Blake's claim on the balance of the fund deposited in the

---

79. See cases cited *supra* note 70.

80. Kosty v. Lewis, 115 U.S.App.D.C. 343, 349, 319 F.2d 744, 750 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964); Munter v. Lankford, *supra* note 68, 98 U.S.App.D.C. at 117–118, 232 F.2d at 375–376.

81. This was so whether the assignment was governed by District or by Maryland law. D.C.Code § 28–2303 (1961); Md.Code art. 8, § 1 (1957). See note 44 *supra* and accompanying text.

82. Fed.R.Civ.P. 17(a). See also D.C. Code § 28–2303 (1961); Compton v. Atwell, 93 U.S.App.D.C. 99, 101–102, 207 F.2d 139, 141–142 (1953). By the view we prefer, this follows notwithstanding the fact that the assignment was for purposes of security. 3A J. Moore, Federal Practice ¶ 17.09 [1–1] at 279 (2d ed. 1970). Even by the other view in vogue, Fox-Greenwald, as assignor, retained sufficient title to support an action in its own name, Texas San Juan Oil Corp. v. An-Son Offshore Drilling Co., 194 F.Supp. 396, 397 (S.D.N.Y.1961), with the result that its institution of the suit tolled the statute on the claim as a whole. Kelley v. Bluff Creek Oil Co., 158 Tex. 180, 309 S.W.2d 208, 212 (1958). And in any event Markowitz, with full knowledge of the assignment, waived any defect in this regard by failing to object. Pierce v. Gillet & Co., 64 App.D.C. 156, 157, 75 F.2d 675, 676 (1935).

83. See cases cited *infra* note 84.

84. Weldon v. United States, 65 F.2d 748, 749 (1st Cir. 1933); Hoffman v. United States, 32 F.Supp. 939, 941 (S.D.N.Y. 1940); Iowa Nat'l Mut. Ins. Co. v. Chicago, B. & O. R.R., 246 Iowa 971, 68 N.W.2d 920, 926–927 (1955); Service v. Farmington Sav. Bank, 62 Kan. 857, 62 P. 670, 671–672 (1900); Roberts v. United States Fidelity & Guar. Co., 273 S.W.2d 39, 41 (Ky.1954); Van Der Stegen v. Neuss, Hesslein & Co., 270 N.Y. 55, 200 N.E. 577, 578, 105 A.L.R. 605 (1936); Suber v. Chandler, 36 S.C. 344, 15 S.E. 426, 427 (1892); Yeary v. Hinojosa, 307 S.W.2d 325, 333–334 (Tex. Civ.App.1957); Corrigan v. Stormont, 160 Va. 727, 170 S.E. 16, 17–18 (1933).

85. Compare Link Aviation v. Downs, 117 U.S.App.D.C. 40, 42, 325 F.2d 613, 615 (1963).

**1360**

registry of the District Court has priority over the Government's.[86] We accordingly reverse the judgment appealed from, and remand the case to the District Court for distribution of the fund consistently with this opinion.[87]

So ordered.

---

86. With this disposition, we need not consider the question whether in any event the Government could assert the statute of limitations against Blake. See, however, Chafee v. Blatchford, 17 D.C. (6 Mackey) 459, 482–484 (1888).

87. We note from the record in Blake's suit against Fox-Greenwald that, after submission of this appeal, a judgment was entered in Blake's favor but only against one of the individual defendants therein. See note 8, *supra*. The record in that case does not elaborate further, and neither it nor any party has informed us as to any satisfaction of that judgment. On remand, the District Court will of course make appropriate inquiry in that regard, and any adjustment of Blake's recovery from the in-court fund as may be warranted on that account.